## UNITED STATES *v.* BARLOW and another.[1]

*(Circuit Court, D. Colorado.　December 18, 1885.)*

POSTAL LAWS—ILLEGAL CONTRACT TO CARRY MAIL—RIGHT OF UNITED STATES
　TO RECOVER AMOUNT ILLEGALLY PAID.

　　Where an assistant postmaster general changes a mail route, and makes a
　contract which he has no authority to make, for a different route, and there-
　under the contractor carries the mail at greater expense, and receives a greater
　compensation for such carriage than he was entitled to under the former con-
　tract, the United States cannot recover the amount illegally paid, in the absence
　of fraud in the procurement of the contract.[2]

At Law.

*H. W. Hobson,* U. S. Dist. Atty. Colo., and *Geo. L. Douglas,* for the
United States.

*L. S. Dixon* and *Pitkin & Richmond,* for defendants.

HALLETT, J., *(charging jury orally.)*　This contract, gentlemen, is
dated March 15, 1878, and provides for carrying the mail from Gar-
land, by way of Fort Garland and other points, to Lake City, and
thence, by way of Sherman, Burrows Park, Tellurium, and Animas
Forks, to Ouray, and back, seven times a week, from the first day of
July, 1878, to and including the thirtieth day of June, 1882, and
the contractor, Mr. Vorhiss, was to receive $19,000 for this service.
This was at the rate, as stated by counsel, of $96.39 per mile for the
entire distance.　The entire distance was 196 miles.　There is a
schedule attached to the contract in which the time is given.　It was
provided that mail should leave every day at 8 P. M., (leave Garland
and arrive at Lake City in 27 hours,) and should be carried back from
Lake City in the same time, and then it should leave Lake City at 1
A. M., daily, and arrive at Ouray in 30 hours, and be carried back in
the same time.

　　Now, it is said, and the evidence tends to prove, that as to the part
between Ouray and Lake City, it was found impracticable to carry
the mail.　In the summer time it could be carried with pack animals,
but for several months,—the greater part of the year during the fall,
winter, and spring—it could only be carried by men on snow-shoes,
and perhaps not at all, part of the time.　It may be said, upon the
evidence, that it was ascertained that practically the contract could
not be executed as to the part between Lake City and Ouray,—not in
the time provided in this contract, of 30 hours, which was a rate of
one and one-half miles per hour, about,—nor in any time,—it could
not be done at all; so that, in the condition of things, we have a con-
tract which was capable of being carried out as far as Lake City,—

---

[1] Reported by Robertson Howard, Esq., of the St. Paul bar.

[2] See *United States* v. *Cosgrove, post,* 908.

that is, between Garland and Lake City,—and incapable of execution between Lake City and Ouray.

Now, in that state of affairs, it seems, I may remark, that some of the people residing in Ouray, and elsewhere in that country, anxious to have a mail between Lake City and Ouray, applied to the department to have a change made in the route, so as to lay it upon an entirely different country,—an entirely different line. Instead of going over the mountain, a distance of 46 miles, they were to go around the greater part of the mountain, a distance of 110 miles. And in that petition and application, such as they were, the petitioners proceeded upon the hypothesis that the contract could not be carried out, in the way in which it was made, by carrying the mail by way of Mineral Point, over this great range of mountains;—it must be carried in some other way, if at all.

Now, in that condition of things, they applied to the department to make a change, and the officer of the department, who was an assistant postmaster general, I suppose, of some number,—whether first or second or third or fourth, I do not recall,—but he assumed to proceed under this section of the statute:

"Compensation for additional service in carrying the mail shall not be in excess of the exact proportion which the original compensation bears to the original service; and when any such additional service is ordered, the sum to be allowed therefor shall be expressed in the order, and entered upon the books of the department, and no compensation shall be paid for any additional regular service rendered before the issuing of any such order."

The language of that section is very general: "Compensation for additional service in carrying the mail shall not be in excess," etc. It does not say what kind of service, or in what way it shall be additional to the service already rendered; but it is observed that, with reference to the matter which was presented for the consideration of the postmaster general, this was a service in substitution for something that could not be done. It may be said, in one sense, that it was additional to some service that the contractor was already rendering under this contract; but, in respect to the particular thing to be accomplished by it,—to get the mail from Lake City to Ouray,— it was in substitution for it,—it was an entirely new thing. But he proceeded under the authority of this statute, whatever it may be,— and assumed that he could select a new line not at all like the one which he was abandoning, and in which a service had been required at the rate of a mile and a half an hour; and it was his duty, under this statute, to require the same service upon this new route, although it was entirely different. The change was made expressly with a view to get a practicable route,—to abandon one that was impracticable, and to take one that would be practicable for wheeled vehicles. He assumed that he was to take the same time in carrying out this contract. In that he made a very great mistake. This statute authorized nothing of the kind. The time had been fixed with reference to

the route over this great mountain, which was probably known to be exceedingly difficult,—impossible during a considerable part of the year. The time had been fixed with reference to that; and to say that that should apply to another route,—an entirely new one, different as to every foot of the way,—there was not a single mile or yard of it that was the same as the route which was abandoned,—to say that that was to go upon the same time was mere assumption. Whether he was authorized to order these contractors, under this contract, to proceed according to the rate of speed upon this new route which had been fixed between Garland and Lake City, and which was about 5.92 miles per hour,—very nearly 6 miles,—150 miles in 27 hours,—is very doubtful; but, under the circumstances, that is all that can be claimed under this contract,—that he was authorized to proceed under this statute, and to require the service to be performed in the same way that it was performed upon the remainder of the route which was found to be practicable for wheeled vehicles; but, in view of the circumstances that it has been thought necessary in making this contract to divide the ground so as to get a very different rate of speed in one part,—the part lying between Lake City and Ouray,—from that which obtained between Garland and Lake City, it is very doubtful whether he could proceed at all, under this statute, or whether he could order the carriers to proceed from Lake City to Ouray by this new line at the same rate of speed which had been adopted from Garland to Lake City.

But I need not consider that. He did not do that, and what he did do he had no authority to do,—to make the rate of speed a mile and a half an hour, around from Lake City to Ouray, on this new route; and so, also, the increasing the speed upon the same basis was an act which he was not authorized to perform under the statute. Now, I must say to you, in addition to this, that my understanding is that under the law, and under the regulations of the department, all contracts for mail service are to be let upon general bidding, by advertisement for a certain time, in the papers, giving to all persons disposed to enter into such business an opportunity to bid for the contracts, and the contracts are let for four years, or something like that. The postmaster, when, for any reason, a contract becomes inoperative,—if the contractor fails to perform it, or any difficulty arises in respect to the execution of it,—he is authorized by the regulations to make a contract for temporary service. At the time this contract was made I believe that such contract was for a period of six months. He could make it for a period not exceeding six months. It seems that the time has been since extended to not exceeding one year, for which he may contract for temporary service. Aside from this temporary service, which is intended to fill a gap between the principal contracts, he must proceed according to law to advertise and let a contract by general bidding, by advertisement, and not otherwise. He has no authority to make a contract for a

long time, such as this was; and I have to say to you, upon the statute and the regulations that were in existence at the time, that, in my opinion, the postmaster general was not authorized to make this contract in respect to carrying the mail from Lake City to Ouray, in the way in which he did it. But it seems, from the testimony, that he made an agreement of this kind, and the parties went on and performed it, and have received money under it. Under such circumstances, although made without authority of law, and in excess of all provisions of the statute, and the regulations in respect to these matters, it is my judgment that the government cannot recover any part of the consideration which these defendants have received for carrying the mail, unless, in the making of this contract, there was fraud; and in the circumstances of the case, a fraud which was participated in; which was countenanced and recognized by the officer of the department,—the postmaster general, whether he was third, fourth, or fifth, or whatever his number may be,—and the defendants as well; and whether there was such fraud or not, is a question to be determined upon all the evidence before you.

It is stated by the defendants themselves that none of the parties who were making this contract knew anything at all as to the nature of the service to be performed, and nevertheless they set about making a statement that a certain force would be required to carry the mail over this new route; as, that if it were to go in 72 hours it would require 22 horses and 12 men, and if it was to go in 36 hours, as it was in fact carried, it would require 66 horses and 22 men. There is no proof that no such force as that was required, or, at least, not nearly so much. Now, upon the evidence which is before you as to the manner of computing the amount which was to be paid for carrying this mail, and the force to be used in respect to it, you are to say whether these parties, in making an agreement of this kind, contemplated a fraud upon the government; and by fraud I mean that there should be excessive pay for this service. It seems that the amount to be paid was $26,658 per annum, and it was raised to this point upon some estimate. I don't know precisely how,—some estimate as to the cost of the service, which was based upon these figures, which were put into the office of the postmaster general by Mr. Sanderson, and apparently acted upon by him. In general, I suppose, over an ordinary road, it must be known by men in this business what force is required to carry a mail of ordinary weight in such a country as that; the number of horses, and what number of buck-boards or coaches; what number of men: in other words, the cost of carrying it, it seems to me, must be pretty clear to persons who are familiar with this service.

Now, if, upon all that took place then at the office of the postmaster general, you are of the opinion that these parties combined and agreed to raise the compensation to an extraordinary figure, with a view to benefit the defendants, knowing that the compensation was

excessive, then I think the government may sue for it, and recover it back. If they were acting honestly and fairly, and in the belief that they were dealing fairly with each other; that this was a reasonable compensation for the service to be performed,—there can be no recovery; and this without reference to what the service actually cost afterwards, and without reference to what the fact turned out to be with respect to the force required. The testimony as to the force actually used was given only to explain how the parties must have understood it at the time this contract was made; that is to say, persons familiar with this service,—the postmaster general himself, or the men in his office,—must have known something about what force was required to carry mail 110 miles, letting as many mail contracts as they do. Certainly the defendants know all about it, and if they stated the force in excess of what the service actually required for the purpose of getting an extraordinary compensation, and there was an intention on their part at that time, and an intention on the part of the officer letting the contract, that they should have extraordinary compensation for this service, then the government may recover. That is the question for your consideration, gentlemen.

There are one or two instructions here, asked on behalf of the defendants, which I will give, as follows:

"Fraud, in transactions of this nature, is never presumed. The presumption of innocence prevails until the contrary is proved by fair and reasonable preponderance of the evidence.

"In such cases, also, the presumption is in favor of the innocence and integrity of the action of the public officers. The acts of the postmaster general and his assistants, coming within the scope of their powers, are presumed to be honest and fair until the contrary is established by a preponderance of proof."

In this case the presumption is the orders in question were honestly and properly made; that is not a subject which you are to consider. I advise you the postmaster general had no authority to make such orders as he did make; but as to the intention of the parties in the premises,—that of the defendants, also,—the presumption is that they were acting fairly and honestly, unless that be overcome by the evidence. If the circumstances are such as to convince you that they were not so acting, that there was an intention on the part of these parties to get an excessive price from the government for this service, and this was carried into the contract, then the plaintiff may recover, otherwise not.